IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TARGET TELEPHONE #1 (603) 507-3546 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS | Case No.   19-mj-35-01-AJ_____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Timothy Keefe, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with the accounts related to the cellular telephones assigned call number (603) 507-3546 (Target Telephone #1), no subscriber, Reseller Tracfone Wireless, and believed to be used by Jeffrey BAILEY (BAILEY), that is stored at premises owned, maintained, controlled, or operated by Verizon Wireless ("Verizon Wireless"), a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.  The information to be searched is further described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon Wireless to disclose to the government records and other information in its possession pertaining to the subscribers or customers associated with the accounts, including the contents of communications.

2.       I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), currently assigned to the DEA Portsmouth Tactical Diversion Squad (TDS).  I have been a law enforcement officer with the Dover, New Hampshire Police Department since 2000.  I

have been a TFO with DEA since 2013.  As a TFO, I am a federal law enforcement officer within the meaning of Fed. R. Crim. P. 41.

3.      During my employment with the Dover Police Department and DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including heroin, oxycodone, cocaine, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Section 846, and the drug laws of the State of New Hampshire.  I have received training in the field of narcotics enforcement and investigations.  I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs.  I have been the Affiant on affidavits in support of arrest warrants and search warrants.  I also have participated in other electronic intercept investigations. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored and distributed and with the methods of payment for such drugs.  I am familiar with the common appearance, packaging, texture, and smell of narcotics including heroin, oxycodone, and other illegal drugs.  I have debriefed more than 100 defendants, informants and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations. Personally, I have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, and acting in an undercover capacity.

4.      Based on my training and experience, I know that individuals who distribute narcotics often utilize cellular telephones, and the text messaging capability included within their cellular telephones, as a method by which to arrange narcotics transactions.  I also know that individuals involved in the distribution of controlled substances frequently talk in code, either during conversations or while utilizing the text messaging function within their cellular

2

telephone, as a means with which to avoid detection and apprehension by law enforcement.  In

addition, through investigations and training, I know that drug traffickers may: (a) not maintain

cellular telephones for significant periods; (b) obtain cellular telephones with false identification

information; and/or (c) obtain cellular telephones which do not require the purchaser to disclose

personal identification information during the transaction.  Such methods are utilized in order for

those involved in illicit drug activity to avoid discovery by law enforcement.

   5. The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses, including information

provided by the DEA Portsmouth TDS, New Hampshire State Police (NHSP), and other law

enforcement agencies.  In preparing this affidavit, I have prepared reports and reviewed reports

prepared by other investigators regarding witness interviews, surveillance and other investigative

efforts regarding this investigation.  In addition, I have discussed this investigation with other

officers involved in the case.  Through my conversation with other officers and my analysis of

reports prepared by other officers, I am familiar with all aspects of this investigation.  This

affidavit does not contain all of the information gathered during this investigation; rather it

contains information that I believe is sufficient to support my request.

   6. Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of Title 21, United States Code, Section 846

(Conspiracy to Distribute, and Possess with Intent to Distribute, Controlled Substances) and Title

21, United States Code, Section 841(a)(1) (Distribution of Controlled Substances) have been

committed by the individuals currently identified as BAILEY, Thomas FALL (FALL), James

COUGHLIN, and others.  There is also probable cause to search the information described in

Attachment A for evidence of these crimes, as described in Attachment B.

## BACKGROUND OF INVESTIGATION

7.      As set forth in more detail elsewhere in this affidavit, other law enforcement officers and I have been participating in an investigation into the drug trafficking activities of numerous individuals, to include BAILEY, FALL and James COUGHLIN.  Based upon the information obtained in this investigation, I believe that BAILEY, FALL and James COUGHLIN distribute controlled substances, including methamphetamine and fentanyl (Schedule II controlled substances), to customers in New Hampshire.  I further believe that BAILEY utilizes Target Telephone #1 to communicate with drug associates and to otherwise further his trafficking activities.

8.      During this investigation, other law enforcement officers and I have received information from multiple cooperating individuals, whom I will refer to as CS #1, CS #2, CS #3, and CS #4. To the extent possible and practical, CS #1's, CS #2's, CS #3's and CS #4's information has been checked and corroborated. Investigators have relied on independent sources, such as witness interviews, physical and electronic surveillance and open source database searches to corroborate information from CS #1, CS #2, CS #3 and CS #4. To the best of my knowledge, CS #1's, CS #2's, CS #3's and CS #4's information has never found to be false or misleading.  For these reasons, I consider the information provided by CS #1, CS #2, CS #3 and CS #4 to be reliable.

9.      Since July 2018, CS #1 has been providing information to law enforcement in exchange for consideration in a potential criminal matter. CS # 1 has been arrested multiple times and it appears CS #1 has felony convictions for drugs and for being a fugitive from justice in addition to misdemeanor convictions for willful concealment, receiving stolen property and fraudulent use of a credit card.  CS #1 is not currently actively cooperating in this investigation

4

but is willing to testify. Because the information provided by CS#1 has been corroborated, I believe that CS #1 is reliable.

10.     Since December of 2018, CS #2 has been providing information to law enforcement in exchange for consideration in a potential criminal matter. CS # 2 has been arrested in the past for misdemeanor charges to include possession of drugs, resisting arrest and willful concealment. CS #2 is actively cooperating in this investigation and is willing to testify. Because the information provided by CS#2 has been corroborated, I believe that CS #2 is reliable.

11.     Since December of 2018, CS # 3 has been providing information to law enforcement in exchange for consideration in a potential criminal matter. CS # 3 has been arrested multiple times and it appears CS #3 has a criminal history that includes felony convictions for Possession of Drugs, Receiving Stolen Property, Burglary, Forgery, Willful Concealment, Theft by Deception, as well as misdemeanor convictions.  CS #3 is not actively cooperating in this investigation and but is willing to testify. Because the information provided by CS #3 has been corroborated, I believe that CS #3 is reliable.

12.     Since January of 2019, CS #4 has been providing information to law enforcement in exchange for consideration in a potential criminal matter. CS #4 has been arrested multiple times and it appears CS #4 has a criminal history that includes felony convictions for Possession of Drugs, Theft by Unauthorized Taking, Operating after Certified Habitual Offender, as well as numerous misdemeanor convictions. CS #4 is not actively cooperating in this investigation but is willing to testify. Because the information provided by CS #4 has been corroborated, I believe that CS #4 is reliable.

13.     In early January of 2018, DEA TDS initiated an investigation into FALL. NHSP conducted a traffic stop of a vehicle occupied by SOI #1and Ryan LANDERS on Route 95 North in Greenland, New Hampshire. The NHSP seized approximately four "fingers" of fentanyl from the side of the road that were discarded from the vehicle. [1] The fingers were subsequently sent to the DEA Lab and tested positive for the presence of fentanyl. SOI #1 agreed to cooperate and provided information regarding FALL, Jeffrey COUGLIN and James COUGLIN, who are all half-brothers. [2]  According to SOI #1, FALL and James COUGHLIN order crystal methamphetamine over the internet utilizing the mail or FedEx and use Bitcoin as payment. SOI #1 admitted to having done this him/herself and to showing the brothers how to do this. SOI #1 estimated the FALL/COUGHLIN brothers were receiving about a pound of methamphetamine at a time through the mail or FedEx and SOI #1 observed them in possession of up to five (5) pounds of crystal methamphetamine. SOI #1 stated the COUGHLIN brothers sold ounces of crystal methamphetamine for approximately $1200.00 to $1300.00 per pound.

14.     On July 2, 2018, the NHSP arrested SOI #2 after seizing approximately 30 grams of Fentanyl from his/her person. The exhibit was sent to the NHSP Lab and tested positive for the presence of fentanyl. During a post arrest interview, SOI #2 stated he/she would obtain fentanyl from FALL, and had been to FALL's residence at 6 Willey Street in Rochester, New Hampshire to pick up fentanyl.  SOI #2 had purchased two "sticks" (approximately 20 grams) of fentanyl from FALL for $450. SOI #2 wanted to purchase five "sticks" (approximately 50

---

[1] I know based on my training and experience that a "finger" of fentanyl is approximately ten grams.

[2] Jeffrey COUGHLIN is currently serving a three-year prison sentence at the New Hampshire State Prison for Sale of a Controlled Drug (Fentanyl). While on bail for this charge, Jeffrey COUGHLIN was arrested for Possession of a Controlled Drug (Fentanyl).

grams) of fentanyl, but FALL only had 20 grams available. FALL told SOI #2 that he was expecting a delivery of more fentanyl that evening, but advised SOI #2 that his "runner" had been stopped by the police and $5400 worth of fentanyl had been seized.

15.     On July 16, 2018, NHSP stopped FALL driving northbound on Rte. 95 in Portsmouth, New Hampshire.  SOI #3 was a passenger in the vehicle and was subsequently arrested on a probation violation warrant. Following SOI #3's arrest, SOI #3 agreed to cooperate. SOI #3 stated that during the stop, the NHSP trooper missed 100 grams of fentanyl, which FALL hid in a speaker or subwoofer. According to SOI #3, FALL picks up fentanyl every few days and has a Dominican male source of supply named "Flaco."  SOI #3 stated that FALL was paying $200 per "stick."  SOI #3 stated the fentanyl comes in loose powder form and on one occasion, SOI #3 bought 250 grams of fentanyl from FALL that looked as if it was broken off a brick style kilogram. SOI #3 stated that FALL has a second source of supply of fentanyl who presses the fentanyl in Lawrence, Massachusetts and charges $180 to $200 per "finger" depending on the amount purchased.  SOI #3 confirmed James COUGHLIN and FALL were ordering several ounces of methamphetamine online and having it shipped to Nora COUGHLIN's residence in Exeter, New Hampshire or to COUGHLIN's old residence in Milton Mills, New Hampshire. Norma COUGHLIN is the mother of FALL and James COUGHLIN.  The packages were delivered to the homes and left on the front porches for James COUGHLIN or FALL to retrieve. James COUGHLIN had purchased property in Wakefield, New Hampshire and was fixing a camper on the site. James COUGHLIN would travel to Manchester, New Hampshire with $2500 to purchase what SOI #3 thought was a kilogram of methamphetamine. Several days later, a package would arrive via mail. James COUGHLIN would then cut the methamphetamine and

sell it for $1000 an ounce. James COUGHLIN told SOI #3 he would show SOI #3 how it is done in case anything happened to him.

16.     On July 17, 2018, CS #1, then a SOI, met with members of the Portsmouth TDS regarding FALL and Jeff COUGHLIN.  CS #1 stated that FALL and Jeff COUGHLIN would talk freely in front of CS #1 about purchasing narcotics and traveling to Lawrence, Massachusetts to obtain 50 "fingers" (approximately 500 grams) of fentanyl. FALL and Jeff COUGHLIN were selling the "fingers" for $350 each.  The two also sold methamphetamine, cocaine and pills.

17.     On September 14, 2018, Portsmouth DEA TDS conducted an undercover purchase of crystal methamphetamine from SOI #4 in Rochester, New Hampshire. SOI #4 was observed exiting a white colored van with NH registration 4317037 registered to Lanna SPURLOCK, 22 Main St., Milton Mills, New Hampshire. Surveillance observed a white male (believed to be James COUGHLIN) in the driver's seat. SPURLOCK is the paramour of James COUGHLIN. In February of 2019, SOI #4 was indicted in the District of New Hampshire for Methamphetamine trafficking. According to SOI #4, in February of 2018, SOI #4 was getting methamphetamine from James and Jeff COUGHLIN.  SOI #4 also bought approximately one ounce of methamphetamine from FALL, but SOI #4 thought FALL was mostly selling heroin/fentanyl.

18.     On October 1, 2018, Homeland Security Investigations (HSI) in California seized a packaged destined to "J COUGHLIN, 75 Stoneham Road in Sanbornville, NH." The package contained approximately one pound of methamphetamine.  The package was forwarded to HSI in New Hampshire for law enforcement to attempt a controlled delivery.  On October 4, 2018, this Court authorized an anticipatory search warrant of the residence located at 75 Stoneham Road,

Sanbornville, New Hampshire. During the controlled delivery**,** SPURLOCK met law enforcement in the driveway. SPURLOCK advised she was the wife of James COUGHLIN and signed for the sham package. SPURLOCK denied all knowledge of the contents of the package. Among items seized during the search of the premises were two plastic baggies that contained approximately 10 grams of methamphetamine.

19.     On December 6, 2018, CS #2 stated FALL and his brothers, Jeff COUGHLIN and James COUGHLIN, were selling heroin/fentanyl and methamphetamine. CS #2 stated he/she could purchase narcotics from FALL'S girlfriend, Carissa COBURN, and that FALL and COBURN live on Willey Street in Rochester, New Hampshire. According to CS #2, COBURN and FALL would sell around 5 grams of fentanyl for 200 dollars.  CS #2 stated that FALL is also working with the COUGHLIN brothers to further their drug sales.

20.     On December 20, 2018**,** CS#3 was arrested for Conspiracy to Distribute Fentanyl in District of New Hampshire. CS #3 advised he/she met Jeff COUGHLIN and FALL through a friend in/around 2017 and started "running" drugs for them around January of 2018 and continued until around the summertime of 2018.  FALL would pay CS #3 approximately $100 and one "stick" per ten "sticks" that CS #3 would pick up.  FALL was purchasing fentanyl for approximately $200 per "stick".  CS #3 explained he/she first started bringing "dope" back to Jeff COUGHLIN, but then eventually he/she would drop it off to FALL's  Willey Street residence. CS #3 estimated he/she would drop off 10 – 30 "sticks" a day to FALL.  FALL was also distributing methamphetamine that the COUGHLIN brothers and FALL purchased on the dark web, and FALL told CS #3 that James COUGHLIN was the "dark web guy."  According to CS #3, Jeff COUGHLIN and FALL would sell a finger of fentanyl for approximately $300 and methamphetamine for $200 for an "eight ball", which I know based on my experience, is street

lingo for 1/8 of an ounce. CS #3 further stated that James COUGHLIN was having packages of methamphetamine sent "up north" into the Wakefield, New Hampshire area, near Acton, Maine. I believe this location is a reference to James COUGHLIN's residence in Sanbornville, New Hampshire where the seized one pound package of methamphetamine was destined for. When NHSP arrested CS #3 in June 2018, he/she was in possession of 27 "fingers" (approximately 270 grams). CS #3 explained that on that day, FALL called him/her and said he needed "stuff" (a reference to fentanyl) that day. CS #3 met with FALL, drove to Lawrence, Massachusetts and met with FALL's source. On the way back to New Hampshire, the NHSP stopped CS #3 along with others in the vehicle.

21.    On January 30, 2019, CS #4, at the direction of DEA contacted FALL about purchasing fentanyl. The two met at the Cumberland Farms in Rochester, New Hampshire. During the meeting, FALL asked CS #4 if he/she, "needed anything" meaning fentanyl. Due to logistics, CS #4 was directed to decline the offer and arraigned to speak with FALL the following day to set up a future purchase. The second meeting never occurred.

22.    On April 25, 2019, DEA conducted surveillance on FALL's residence 6 Willey Street residence and observed a vehicle registered to BAILEY, 39 Columbus Avenue, Dover, New Hampshire. Several minutes later, BAILEY departed the residence and was followed by law enforcement to Somersworth where BAILEY picked up a female subsequently identified as Jocelyn NOONAN. The NHSP conducted an interdiction stop of BAILEY's vehicle during which NHSP identified BAILEY as the driver and NOONAN as the sole passenger.

23.    BAILEY provided consent to search his vehicle. The NHSP located a false bottom bleach bottle used to conceal narcotics that contained approximately 30 grams of methamphetamine and approximately 25 grams of heroin/fentanyl. BAILEY was arrested. In a

post-Miranda interview, BAILEY stated he purchased the drugs from a Wes RAMSEY near the Home Depot on North Main Street in Rochester, New Hampshire.  BAILEY stated he sold "fingers" or "sticks" of fentanyl for $250.00 and sold 1/2 ounces of methamphetamine for $550.00. Law enforcement asked BAILEY if he knew any other subjects in the Rochester area. Unsolicited, BAILEY stated he had a friend named Tom "HILL", who lived in the area next to Cleary's Cleaners on Willey Street, but that he had not seen him in several days. Furthermore, BAILEY and stated that "HILL" was just a friend and not in the drug business. Based on my training, experience and observations of that day, I believe Tom "HILL" is a reference to FALL who resides at 6 Willey Street that is behind Cleary Cleaners and that FALL supplied the seized methamphetamine and heroin/fentanyl to BAILEY.

24.     Furthermore, BAILEY stated he had not seen FALL in several days even though investigators observed him earlier that day at FALL's residence. BAILEY also seemed to be shielding FALL, which individuals in the narcotics business will do to protect their sources of supply.

25.     BAILEY provided law enforcement with consent to look through his cellular phone. When asked why no text messages between BAILEY and his narcotics customers or drug sources were stored in his phone, BAILEY responded that he quickly deletes the text messages. Based on my training and experience, I know that narcotic traffickers often delete drug related text messages immediately from their phones to destroy evidence of drug trafficking and to protect their customer base and sources.

**Target Telephone #1**

26.     Target Telephone #1 is a Verizon Wireless cellular phone. On or about February 19, 2019, this phone became active. This phone is subscribed to "TracFone Wireless, Inc." During his post-arrest interview, BAILEY provided Target Telephone's number to law enforcement. I believe, based on telephone toll analysis, that BAILEY has utilized Target Telephone #1 to contact his drug associates.

27.     Between March 27, 2019 and April 15, 2019, BAILEY sent text messages from Target Telephone #1 to FALL phone #1 (603-973-2029) and FALL phone #2 (603-973-1001). Based on information I have obtained during the investigation, information from other law enforcement officers and subscriber information as detailed in this affidavit, I believe that FALL may be the user of telephone numbers 603-973-2029 and 603-973-1001 (both telephone numbers are subscribed under the name Thomas FALL, 6 Willey St., Rochester, NH 03867 and per Sprint PCS, telephone number 603-973-2029 was cancelled on 4/17/2019).

28.     A telephone toll analysis of Verizon Wireless call and text detail records between both of the FALL phones and Target Telephone #1 for the period of March 27, 2019 through April 25, 2019 was conducted. This analysis revealed Target Telephone #1 was in contact with FALL phone #1 (603-973-2029) approximately 95 times from March 27, 2019 through April 17, 2019 (56 phone calls and 39 text messages) and Target Telephone #1 was in contact with FALL phone #2 (603-973-1001) approximately 64 times from April 17, 2019 through April 25, 2019 (42 calls and 22 text messages).

12

29.     On April 24, 2019, FALL phone #2 (603-973-1001) received one incoming text message from Target Telephone #1 and between April 24, 2019 and April 25, 2019, there were approximately seven (7) calls between FALL phone #2 and Target Telephone #1.

30.     On April 26, 2019, the DEA sent a letter requesting that Verizon Wireless preserve the content of text and voice mail messages that have been sent or received over the Target Telephone for the dates of April 16, 2019 through April 26, 2019.  As a result, I believe that Verizon Wireless will have records in its possession related to the Target Telephone.

31.     In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and un-retrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless.  Further, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.  Wireless phone providers often provide their subscribers with voicemail services.  In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

32.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging."  Based on my knowledge and experience, I believe that

stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

33.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

34.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

35.     Wireless providers may also retain text-messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the

14

embedded unique identifiers for a cellular device could take several different forms, including an

Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile

Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile

Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI").

When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique

identifiers to the cellular antenna or tower in order to obtain service and the cellular antenna or

tower records those identifiers as a matter of course.

36.     Wireless providers also maintain business records and subscriber information for

particular accounts.  This information could include the subscribers' full names and addresses,

the address to which any equipment was shipped, the date on which the account was opened, the

length of service, the types of service utilized, the ESN or other unique identifier for the cellular

device associated with the account, the subscribers' Social Security Numbers and dates of birth,

all telephone numbers and other identifiers associated with the account, and a description of the

services available to the account subscribers.  In addition, wireless providers typically generate

and retain billing records for each account, which may show all billable calls (including outgoing

digits dialed).  The providers may also have payment information for the account, including the

dates and times of payments and the means and source of payment (including any credit card or

bank account number).

37.     In some cases, wireless subscribers may communicate directly with a wireless

provider about issues relating to the account, such as technical problems, billing inquiries, or

complaints from other users.  Wireless providers typically retain records about such

communications, including records of contacts between the user and the provider's support

services, as well records of any actions taken by the provider or user as a result of the

communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

38.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

39.     Based on the forgoing, I request that the Court issue the proposed search warrant.

40.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

41.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.

/s/ Timothy Keefe
Timothy Keefe
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on June  13  , 2019.

Andrea K. Johnstone
United States Magistrate Judge

17

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with cellular telephone assigned call number (603) 507-3546 (TARGET TELEPHONE #1), subscribed to "TracFone Wireless, Inc." which is assigned Device Identification #89148000004557276543 or IMEI #356905092851765, and is believed to be used by Jeffery BAILEY and is serviced by Verizon that are stored at premises owned, maintained, controlled, or operated by Cellco Partnership, doing business as Verizon Wireless ("Verizon Wireless"), a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.

## ATTACHMENT B

### Particular Things to be Seized

## I.  Information to be disclosed by Verizon Wireless

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon Wireless, including any messages, records, files, logs, or information that have been deleted but are still available to Verizon Wireless or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon Wireless is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

b.      All existing printouts from original storage of all of the text messages described above;

c.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from February 19, 2019 to present;

d.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message;

e.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names,

2

addresses, shipping addresses, date account was opened, length of service, the types of service

utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device

associated with the account, Social Security number, date of birth, telephone numbers, and other

identifiers associated with the account;

f.      Detailed billing records, showing all billable calls including outgoing digits, from

February 19, 2019  to present;

g.      All payment information, including dates and times of payments and means and

source of payment (including any credit or bank account number), from February 19, 2019  to

present;

h.      Incoming and outgoing telephone numbers, from February 19, 2019  to present;

i.      All records indicating the services available to subscribers of individual accounts

and/or identifiers described above;

j.      All records pertaining to communications between Verizon Wireless and any

person regarding the account or identifier, including contacts with support services and records

of actions taken.

**II.  Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and

instrumentalities of violations of 21 U.S.C. § 846 (Conspiracy to Distribute, and Possess with

Intent to Distribute, Controlled Substances) and 21 U.S.C. 841(a)(1) (Distribution of Controlled

Substances) involving BAILEY since February 19, 2019, to present, for each account or

identifier listed on Attachment A, information pertaining to the following matters:

3

(a)  The acquisition, storage, and distribution of fentanyl, methamphetamine, or other controlled substances, and the disposition of proceeds of the sales of controlled substances, including the identity or activities of sources of supply, customers, runners, or others who facilitate in the commission of these drug trafficking offenses;

(b)  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(c)  The identity of the person(s) who communicated with the user ID about matters relating to drug trafficking and the disposition of the proceeds of drug trafficking, including records.